WILLIAM H. TABOR, ADM'R, ET AL. v. THE MICHIGAN MUTUAL LIFE INSURANCE COMPANY.

*Insurance—Revivor of policy—Payment by note—Renewal receipts—Surprise as ground of equity.*

A life insurance agent by false representations that a policy had become forfeited, and by great urgency, persuaded the insured, who was too feeble to withstand his arguments, and whom he would allow no time for consultation, to give up his policy which was for the benefit of his wife, and accept instead a policy, for its surrender value. The wife was not consulted as if she had any rights, and the husband died soon afterwards. *Held,* that a bill seasonably brought by the wife to compel the re-establishment of the policy, should be sustained.

The acceptance of a note for the amount of premium due on a life insurance policy and the giving of a renewal receipt by the company, amount to a payment of the premium.

The doctrine which makes parties bear the consequences of mistakes of law is often hard and can only be maintained on grounds of general policy. It is not so universal as to exclude relief in some instances where mistake is only one element and is combined with the fraud or misconduct of the other party.

Equity often gives relief where one has been surprised into doing what it is inequitable to hold him to, where fact and law are blended, or where the mistake of law is so combined with other things that it cannot reasonably be regarded as a deliberate blunder.

A delay of less than two months in filing a bill to obtain the re-establish-

ment of an insurance policy, the surrender of which had been procured by fraud was not such delay as to preclude relief, the insured having died meanwhile, and the beneficiary being his wife, and no injury being caused to the company.

Appeal from Hillsdale.  Submitted April 22.  Decided October 13.

BILL to revive policy of life insurance.  Defendant appeals. Affirmed.

*E. L. Koon* for complainants.

*Wilkinson, Post & Wilkinson* and *C. A. Kent* for defendant.

CAMPBELL, J.  The bill in this cause was originally filed to obtain the revival and establishment of a policy of life insurance, issued January 20, 1874, for $5000, on the life of Benjamin F. Tabor, now deceased.  The policy was issued to Sarah A. Tabor, his wife, and payable to her, or in case of her death to their children.  The premiums were payable annually.  In every instance notes were taken signed by Benjamin F. Tabor, the last note being for the premiums of January 20, 1877.  This note was dated January 20, 1877, and was payable at six months for $179.97, with interest at ten per cent.  It was not paid at maturity, and was extended to November 1, 1877.  When this note was given a renewal receipt was delivered, acknowledging payment of the premium.

On the 7th of December, 1877, one Vanderburg, an agent of defendant, called on Benjamin F. Tabor and procured a delivery up of the policy, on a claim that it was forfeited, and a paid-up policy was sent to him for $265, which is claimed to be the surrender value of the first policy after deducting the premium note and interest.  This was sent to Mr. Tabor a few days after the old policy was given up. The bill was filed on the 13th of February, 1878, after tender of full premium and of the substitute policy, and refusal by defendant to restore the old one.

The bill claims the surrender of the first policy was obtained by improper means and under circumstances indicating actual or constructive fraud.

It appears that all the negotiations were had between Vanderburg and Benjamin F. Tabor, and without any dealings with Mrs. Tabor, and without procuring her signature to the surrender, and that the new policy was sent to her husband and not to her. The original policy was in her hands and handed over by her when Vanderburg and her husband met at the house to get it. But she was not treated as having anything to say about it, or as having any right to be consulted or dealt with. At the time of its surrender she was only informed in a very general way that it was forfeited, and that the only thing to be done was to take a paid-up policy for such sum as would be fixed by defendant.

The defense is based on two principal grounds, *first*, that the surrender was voluntary, and *second*, that there was injurious delay before suit brought.

Upon the most important facts there is not much dispute, although upon some things the discrepancies are more serious. Much of the testimony was taken on a legal theory of defense which is now abandoned, leaving the substantial controversy much narrowed.

It was at first claimed, and the defense was originally chiefly rested on the claim, that when the policy in dispute was given up it had been already forfeited, and the surrender was all that the insured could desire. But in the case of *Mut. Ins. Co. v. Bowes* 42 Mich., 19, it was held in a similar case arising out of a policy issued by the present defendant, that the acceptance of note and giving renewal receipt, as in the case before us, operated as a complete and not as a conditional payment of premium. And it is not now seriously contended that there was anything unpaid or any forfeiture of the policy now litigated. The defense, therefore, is brought down to a surrender made under a mistake of law, but which is relied on as intentional and binding.

Before considering the facts it is perhaps desirable to look at the condition of things as assumed by the defense to have

existed on the theory of non-payment.    It is admitted in the
answer and there is no. doubt of the fact that the time of
payment of the premium note was extended until November
1, 1877, and that up to that date there was no default which
could have caused any forfeiture.    By section 2952 of the
Compiled Laws, it was provided that no policy should become
void by reason of unpaid premiums, but that a paid-up policy
should be issued to the party in default applying for it, for a
value to be ascertained according to the age of the insured,
under the " American.Experience" tables : and liability was
to cease if application was not made to the company within
one year after default.

Regarding the payment as in default January 20, 1877,
the parties had until January 20, 1878, to apply.    If reck-
oned, as it would have been, from November 1, 1877, then
they would have had until November 1, 1878, long before
which time Benjamin F. Tabor died, and the right to a
money payment matured.    There was not on any theory any
pressing reason for haste.    Upon the theory on which the
company appears to have acted no premium was earned for
1877, and the adjustment which took out the whole premium
note and ten per cent. interest from its date was incorrect, on
any theory.    No data are given in the record from which it
can be determined on what basis the paid-up policy was cal-
culated, so as to give its precise and proper value.    This was
not dwelt upon on the argument, as the case was put upon
the general equities.    It is not, therefore, important except
as having some bearing on the methods by which the surren-
der was brought about.

The facts, as they appear to us as fairly drawn from the
evidence, so far as material, indicate that prior to December
7, 1877, neither Mr. nor Mrs. Tabor had any idea that they
were not fully protected by the policy, or that the premium
was not paid by Tabor's note.    Mr. Tabor's health had been
failing for some months, and was getting worse.    His illness
was such as to affect seriously his nervous system, rendering
him despondent, and impairing his capacity for work and for
resisting importunity.

On the 7th of December Vanderburg called several times during the day at the clerk's office of Lenawee county (Tabor being county clerk), and said he would call till he found Tabor alone, which he did about five o'clock in the afternoon. He then told Tabor he was round gathering forfeited policies, and that Tabor's was forfeited. Tabor stated his understanding that it was not forfeited under the arrangements that had been made. Vanderburg assured him it was forfeited; that the Insurance Commissioner refused to allow notes as assets in making up their balances, and they had therefore been obliged to cut down their capital. He further represented that a great many were surrendering their policies, among others Leonard H. Bailey and Fred. A. Sanders, as well as himself in part. Tabor insisted he did not wish to surrender, but wanted to keep it paid up as he had done thus far. Vanderburg told him he could not do so; that it was already forfeited; and wanted him to surrender it that night. Tabor wanted time to think and to advise with some one. Vanderburg told him he must have it then, that he would have to deliver it up so that he could get a paid-up policy. To Tabor's repeated remonstrances he replied by further urgency and assertions of forfeiture, and refusal to accept payment of the note, or do anything but receive the surrender. When asked how much the paid-up policy would be, he said he did not know, but that the actuary would figure it out. They thereupon went to Tabor's house, when Tabor told his wife Mr. Vanderburg said the policy was forfeited and good for nothing, but that if given up, a paid-up policy would be issued. She got the policy and Tabor signed some endorsement on it and gave it to Vanderburg. Vanderburg made no statements to Mrs. Tabor, but heard what was said by her husband. All the parties seem to have acted on the idea that she had nothing to say in the matter, and that her husband was the person to deal with. She was surprised and could not understand how the policy was forfeited, but assumed her husband and Vanderburg knew how things stood.

Vanderburg represents it differently, and that he first

applied to have the note paid, and told Tabor if not paid he must surrender. There is some testimony from other witnesses indicating that Vanderburg knew that Tabor's life had become precarious, and that he took these steps to save the company from having to pay a loss of $5,000 which was likely to accrue before very long. We are satisfied that the story told by Tabor is true. We are satisfied also that Tabor would have paid the note rather than risk the policy, and that he had reason to think it would not be pressed until Vanderburg's visit.

It is not pretended by Vanderburg that he had any talk on the subject with Mrs. Tabor. So far as she was concerned she acted under the immediate pressure of an assurance without explanation that the policy was forfeited and that a surrender was necessary to save anything. So far as Tabor was concerned it is equally manifest that he was driven by the false statements and urgency of Vanderburg into acting without advice and accepting as true what was not true. For it was not true that the Commissioner would not have recognized or allowed Tabor's note, and it was not true that policies had been surrendered by the parties named. And it was also not true that any forfeiture had been incurred, or that if there had been, it was a matter in which there was any urgency, or anything to be lost by delay. In Tabor's condition he was not capable of standing up against the sort of pressure that was brought to bear on him, and taking advantage of his infirmity was itself fraudulent and unconscionable.

There was no consideration whatever for giving up a valid policy and getting back nothing more than would have been a matter of right in case of actual default, and it cannot be imagined that any such arrangement would have been made unless under some gross mistake, whether brought about by fraud or not. There is no foundation in fact for any claim that there was either bargain or settlement willingly or understandingly made. And so far as Mrs. Tabor is concerned there is no testimony in any way tending to show that

her consent was either asked or given.   She used no judgment in the transaction.

If this had been a mutual mistake of law, and there had been the ordinary surroundings of a fair contract, the application of the rule that relief will not be granted against such mistakes might not be improper.   But this was not a deliberate arrangement, nor was it supposed to be a compromise. It was submission to an unlawful and unjust claim, under circumstances of urgency and undue pressure, and upon false statements of fact.   There can be no doubt that Tabor yielded against his will, and that Vanderburg meant to and did drive him into yielding by pretenses well calculated to deceive him and throw him off his guard.   What he did was reasonable if what Vanderburg said was true.   Having been defrauded in fact, the question is whether the fact that if he had known the law he would probably have done otherwise, puts the case beyond redress.

The doctrine which makes parties bear the consequences of mistakes of law is a hard one in many cases, and can only be maintained on grounds of general policy.   It is undoubtedly expected of persons that they will act with prudence. But the rule is not so universal as to hold parties beyond relief for all cases—however hard—when mistake of law is an important element.   When it is only one of various elements, and is combined with fraud or misconduct, the courts will not refuse to do justice in all cases.   In *Pusey v. Desbouvrie* 3 P. Wms. 315, a release of an orphanage share of a freeman's daughter in London made as a condition of obtaining a legacy, was set aside as made improvidently, though without fraud, where the legatee reposed faith in her brother, the executor, for knowledge of her rights under the custom, and he had innocently failed to enlighten her.   In commenting upon the case Judge Story (1 Eq. § 118) justifies it both on grounds of confidence and also as really involving surprise connected with facts.   In *Evans v. Llewellin* 1 Cox 333, there was no ignorance of facts, and it was held there was no actual fraud, yet on the ground of surprise and action taken suddenly without due caution, a conveyance was set

aside as improvidently made. The cases are quite common in which relief is given where a person has been surprised into doing what it is inequitable to hold him to, when fact and law are blended, or where the mistake of law is so mixed up with other things that it cannot be regarded in the view of good sense just as it would be if it were a deliberate blunder made without haste or artifice. See Story Eq. § 134, and generally §§ 117–139.

In the case before us we have a man who from sickness was practically and obviously unfit to protect himself, beset by very unseemly urgency by a cool and calculating agent who went on purpose to get his policy away from him and not only misstated to him the fact of forfeiture, which was a mixed question of fact and law, but also misinformed him concerning the action of the Insurance Commissioner, and the action of some of his neighbors touching the surrender of their policies. All of these things must necessarily impress any one, if credited, because showing on the one side an official decision on the law as to notes, and on the other acquiescence of business men in its interpretation. The questions of law were not such as most men would in fact know much about, and there are few persons who would not be impressed somewhat by the representations of the agent of a responsible company. While, as we held in *Mayhew v. Phœnix Ins. Co.* 23 Mich. 105, a person cannot generally be justified in acting solely on the statement of his legal rights by an adverse agent in insurance controversies, yet— as there intimated—they may be so mixed with unconscionable conduct as to stand differently. Here there was a positive refusal to give time to take advice, and a positive claim that there must be immediate action or complete forfeiture. If such conduct supported by falsehood in fact, and practiced upon a person weakened by disease, can be held free from legal blame, the doctrine of constructive fraud becomes too technical and attenuated to be of practical service. When a fraudulent result is both designed and accomplished against one comparatively helpless, over nicety is not equity.

If the transaction whereby the policy was procured was

fraudulent, we do not think the delay was such as to render relief improper. The condition of Mr. Tabor was itself such as to excuse both him and his wife from haste, and there were no third parties to be injuriously affected. A tender of the premium in January would not have been accepted, and its omission is not set up in the answer as a ground of defense, and was not given as a reason of refusal. The defendants were in no way injured by the brief space of time that elapsed before filing the bill.

We think the decree should be affirmed with costs.

GRAVES, J., concurred.

COOLEY, J. I have taken a somewhat different view of this case from my brethren, but as the case turns upon the facts I do not deem it important to enter upon a review of them under the circumstances.

MARSTON, C. J., did not sit in this case.