CASPER *v.* BANKERS LIFE INSURANCE CO. OF LINCOLN, NEBRASKA.

1. FRAUD — CONFIDENTIAL RELATIONS — CONCEALMENT OF FACTS — INTENTION TO DECEIVE—REMEDIAL FRAUD.

Where the speaker has superior knowledge or means of knowledge and a relation of confidence exists, such that the speaker knows the hearer relies upon his statements as true, the speaker's expression of an opinion, intended to deceive, constitutes remediable fraud.

---

[1]Fraud, 26 C. J. § 24.

2. INSURANCE — LIFE INSURANCE — FRAUDULENT .CANCELLATION — EQUITY WILL REMEDY FRAUD.

Where a life insurance company, on learning that insured had developed an infirmity, sent its general agent, who was on confidential terms with insured, to demand return of policies for cancellation, and the agent concealed the fact of said infirmity, which was not known to insured, and advised him that it was best for him to surrender the policies, and insured relied on said advice, a fraud was perpetrated upon him which a court of equity will remedy by restoring the policies and awarding the amount thereof to the beneficiary; insured's death having occurred in the meantime.

3. SAME—TENDER OF PREMIUMS.

The beneficiary in life insurance policies fraudulently canceled by the insurer is not obliged to pay or tender payment of premiums which fell due after the cancellation as a prerequisite to bringing suit for their restoration and payment of amount due thereunder.

Appeal from Wayne; Mandell (Henry A.), J.   Submitted January 12, 1927.   (Docket No. 88.)   Decided April 1, 1927.

Bill by Frances R. Casper against the Bankers Life Insurance Company of Lincoln, Nebraska, for the restoration of policies of insurance.   From a decree dismissing the bill, plaintiff appeals.   Reversed, and decree entered for plaintiff.

*James H. Bayne,* for plaintiff.

*Fred H. Aldrich, Arnold F. Zeleznik,* and *C. Petrus Peterson,* for defendants.

CLARK, J.   On June 23, 1922, Edward V. Casper made application to defendant insurance company for policy of insurance on his life in the sum of $1,000, and on June 27, 1922, he made another application for

---

²Insurance, 32 C. J. § 453; ³Id., 32 C. J. § 463.

a policy of $10,000.    In each policy, plaintiff, his wife, was made beneficiary.

The medical examinations for these policies were made June 23d and June 28th of the same year by Dr. William H. Honor, a practicing physician of Wyandotte.    He gave him a thorough physical examination, went over his chest thoroughly, and found and reported him a first-class risk in both cases.    Casper was a young man of great physical strength and vigor, an athlete, in good health, apparently at least.    "He never had need of a physician."    He had attended school and college and was intelligent.    Policies were issued on these applications on August 17, 1922, and delivered.    On December 23, 1922, after Casper had carried home a heavy burden of groceries, he called his wife to him, and, quoting from her testimony:

"showed me a little lump right in the center of his chest between the nipples.

"*Q.* What appearance did it have?
"*A.* Oh, just a little growth.    You could hardly notice it.
"*Q.* What color was it?
"*A.* Flesh color.
"*Q.* Was it any different color to the rest?
"*A.* No, sir, not at all."

He consulted Dr. E. M. Megges, a practicing physician at Wyandotte.    We quote from the testimony of the physician:

"He said, 'I want you to examine me.    I must have hurt myself or something.    When I got home this afternoon with the wife's groceries—look here.'    He had to take his clothes off and I examined him.    I found a small elevation, as though you got a bump or hurt.    It was a sort of swelling.    It was very minute.    *    *    *

"I treated it with iodine.    I told him it would be gone in a day or two.    I thoroughly saturated it. Thinking that I would eliminate the swelling.    I told him to come back in a day or two.    I said, 'That does not look good to me.    It is about two or three

times the size as it was here before.' I said, 'You will have to continue. You come back again. If it don't go away, we will have to take some other measure.' He came back. It was just triple what it was the second time. I said, 'Say, boy, this is something that needs more than I know. I advise you to go to Dr. Cassidy for an x-ray.' This was in the latter part of January, 1923."

The doctor also testified of the lump: "It looked to me as though it came as a flash."

On January 31, 1923, Casper consulted Dr. William J. Cassidy, a physician and surgeon in practice at Detroit, a specialist in surgery and x-ray. The physician found a small lump on the sternum, one-half inch in thickness and three-quarters of an inch in diameter. He thought it a "rather trifling matter." He saw Casper again on February 13th, when the growth had increased 50 per cent. The doctor was apprehensive, and lanced the growth and took a specimen. Casper called again on February 18th. The doctor was "suspicious that he had sarcoma." The laboratory report confirmed his suspicion. Casper's regular physician was told that the matter was serious. But Casper was not told. On February 22, 1923, he again applied to defendant for a policy on his life of $1,000. In this connection Casper stated to the examining physician, Dr. C. W. McCall, quoting:

"How long since you consulted or had the care of a physician? Answer: Two weeks ago. (*b*) Whom, and for what? Did not stop work. I called office. J. D. Cassidy opened small abscess. Insignificant."

The record shows that Casper believed the statements to be true. Of this examination, Dr. McCall reported to defendant company:

"This fellow has an enlargement of years' standing on the sternum, and about the intersection of the third rib. It may be enchondroma. He called on Doctor J. Cassidy, David Whitney building, Detroit, Mich-

igan, about two weeks ago.    He opened it.    On examination I find this enlargement.    I advise you to write the doctor and use my name and see if he has diagnosed the case for sure.    Dr. Cassidy is a specialist in surgery and x-ray.    The applicant says Doctor Cassidy told him to come back if it ever bothered him, and he would remove it any time.    Pending hearing favorably to this, I advise postponement of policy."

M. C. Gray was defendant's general agent at Detroit.    He took all of the applications.    Casper believed him to be a friend.    Shortly before March 13, 1923, Gray received a letter from defendant inclosing check for $166.62, being the total of premiums which Casper had paid on his policies, and directing Gray to pay or tender such sum to Casper and to take up the two policies, defendant stating in the letter to Gray:

"Our reasons for demanding return of the policies are that on his examination made February 24, 1923, he gave us a history of a lesion of the chest, chest wall of long standing, which was not reported when he was examined for the $11,000 insurance in August, 1922.    We have made special investigation since receiving the last examination."

On May 13, 1923, Gray went to Casper's home where he was working.    We quote from his testimony:

"I told him that I had come to take up his policies. He wanted to know what was the matter.    I said, 'Well, the company seems to think you are not a good risk.    They have canceled your policies and have forwarded me the money to return to you and want me to take up those policies.'    He cursed the company and said, 'What is the matter with them?'    I said, 'Well, I do not know what is wrong, only that I think they have a wrong impression.    I think myself that you are a good risk, but I haven't the information they are working on.    And they want me to take up those policies.'    He did not like it a bit.    He said few unkind things and said, 'Now, Mr. Gray, you are a friend of mine; what would you do if you were in my place?'    I said, 'Well, Edward, it is just like this;

if you were to die, your wife—you would be leaving your wife a law-suit, and the company has millions with which to fight, your poor wife wouldn't have anything and wouldn't stand any show whatever, because she couldn't win against them.'   He didn't want to give them up.   He said, 'I hate to do this.   I am sorry it happened.   What's the matter?   Don't you know?' I said, 'I don't know, except here is a letter they have written me demanding that I take up these policies, and in event that you decline to give them up when I tender the money to you I am to bring in a witness that I tendered you the money for these policies. Now, I am satisfied that the company will never accept any more premium money from you.   I think that is the best thing for you to do to take this money.'   He said, 'Well, I am a good risk; I can get insurance all right.'   But he said, 'I don't like to have this happen.'   So repeatedly I had to say to him that the policies would be no good, and a few things like that.   But later on he said, 'Well, give me the money I will turn over the policies.'   So I turned over the money to him which had been sent me by the company and took up the policies.

"*Q.* Did he say anything about your friendship with him?

"*A.* Yes, he alluded to that two or three times.   He said, 'Now, Mr. Gray, I thought you were my friend, I think so yet.   I want you to tell me what to do,' and he put me on my honor to tell him.

"*Q.* You say that he referred to your advice two or three times?

"*A.* Yes.

"*Q.* To you for your friendship and advice?

"*A.* Yes.   *   *   *

"*The Court:* What I would like to ask is this: Were you conscious that you told an untruth?

"*A.* Yes.

"*The Court:* What lie did you tell him?

"*A.* The lie that I told was that it was best for him to give them up.   That was the lie."

Casper sought restoration of his policies through the State department of insurance.   This, on September 18, 1923, resulted in failure.   Then he gave the matter

to an attorney who did nothing. The growth extended into the lung and on January 3, 1924, Casper died of lung metastasis. The following paragraph of the bill of complaint is admitted:

"Plaintiff further avers that on the 16th day of January, 1924, she caused a notice in writing of the death of her said husband, together with a claim and demand for the payment to her of the insurance on the life of her said husband as hereinbefore set forth, to be mailed to said defendant at its home office in the city of Lincoln, in the State of Nebraska, and in response thereto said defendant denied its liability under said policies to said plaintiff."

Alleging fraud, plaintiff filed bill for decree for restoration of the policies and for the amount thereof. The bill was dismissed and she has appealed. The question is that surrender of the policies was procured by fraud.

Dr. McCall was not a witness. The only evidence that deceased, during June, July, and August of 1922, was in anywise physically infirm is the report to defendant by Dr. McCall of about February 22, 1923, that the growth on the sternum was of "years' standing." Against this is the other medical testimony and the history of the growth itself. It came suddenly, "as a flash." Its development was very rapid. The great preponderance of the evidence is that during the months aforesaid, when the applications for the insurance in question were made, the medical examinations had thereon and the policies in question issued, Casper was without physical infirmity.

Between Gray and Casper was a relation of confidence. Casper put Gray on his honor as a friend to advise him on a matter of which Gray had superior knowledge. Gray was defendant's general agent. He had been in the business of life insurance for 31 years. He knew of the unfavorable report of the medical examination on the third application. Casper did not.

Casper thought himself a good risk.   Gray knew he was not.   When Gray advised Casper to accept return of the premium money and to surrender the policies he represented that he was expressing his opinion.   That was a representation of a fact.   It was not true.   Admittedly it was not his opinion. He betrayed Casper's confidence.   He intended to deceive.   This is remediable fraud.   We quote from 26 C. J. p. 1086:

"Where the speaker has superior knowledge or means of knowledge and a relation of confidence exists, such that the speaker knows the hearer relies upon his statements as true, the speaker's expression of an opinion intended to deceive constitutes remediable fraud."

See, also, *Heinlein* v. *Insurance Co.*, 101 Mich. 250 (25 L. R. A. 627, 45 Am. St. Rep. 409) ; *Tabor* v. *Insurance Co.*, 44 Mich. 324; *Picard* v. *McCormick*, 11 Mich. 68; *Hammer* v. *Martin*, 205 Mich. 359; 32 C. J. p. 1259.   There is loose statement in the case relative to cancellation.   Mr. Gray told Casper that the policies had already been canceled.   The evidence does not show that to be true.   Defendant in a paragraph of its answer admitted that the policies had not then been canceled, and in another paragraph admitted that Gray represented to Casper that they had been canceled.   Whether this misrepresentation also constitutes remediable fraud it is unnecessary to determine.

Plaintiff was not, in view of defendant's said attitude toward her claim, obliged to pay or tender premium which fell due after the policies had been taken up.   *Heinlein* v. *Insurance Co., supra;* 2 Joyce on Insurance (2d Ed.), § 1124.

No other question demands discussion.

Decree is reversed, and one for plaintiff will be entered here restoring the two said policies and for

the amount thereof with interest, less $166.62 and interest, and less premium due over the period from March 13, 1923, to January 3, 1924. Plaintiff will have costs in both courts.

SHARPE, C. J., and BIRD, SNOW, STEERE, FELLOWS, WIEST, and McDONALD, JJ., concurred.